The Honorable David G. Estudillo

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILL CO. LTD. a limited liability company organized under the laws of Japan,

Plaintiff,

vs.

KAM KEUNG FUNG, aka 馮 錦 強, aka FUNG KAM KEUNG, aka FUNG KAM-KEUNG, aka KUENG FUNG, aka KEUNG KAM FUNG, aka KAM-KEUNG FUNG, aka KEVIN FUNG, an individual; FELLOW SHINE GROUP LIMITED, a foreign company, and DOES 1-20, d/b/a AVGLE.COM,

Defendants.

Case No.: 3:20-cv-05666-DGE

**PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION DKT. NO. 65**

COMES NOW, Plaintiff Will Co. Ltd. ("Will Co."), by and through its undersigned counsel, and files these Objections to Report and Recommendation, Dkt. No. 65.

## I.   OBJECTIONS AND ARGUMENT

Growth within a specific market for an Internet business is not happenstance but rather based upon intentional design.   What is arguably happenstance is the timing of the Ninth Circuit Court of Appeals' ruling in *Will Co., Ltd v. Ka Yeung Lee, et al.*   Ninth Circuit Court of Appeals Cause No. 21-35617, United States District Court Western District of Washington Cause No. 3:20-cv-05802-BHS, copy attached hereto.   The ruling was issued early morning

PLAINTIFF'S OBJECTIONS TO REPORT AND
RECOMMENDATION - 1  [NO. 3:20-cv-05666 DGE]

**FREEMAN LAW FIRM, INC.**
1107 ½ Tacoma Avenue South
Tacoma, WA 98042
(253) 383-4500 - (253) 383-4501 (fax)

August 31, 2022, the date of this briefing and is unequivocally relevant to the analysis of the instant motion.  The District Court in *Will Co., Ltd v. Ka Yeung Lee* dismissed the action for lack of personal jurisdiction.  The Ninth Circuit Court of Appeals overturned that decision, finding express aiming in the United States and harm in the forum.  Since the facts of this instant matter are strikingly similar to *Will Co., Ltd v. Ka Yeung Lee,* in fact, identical in all meaningful ways, this Court should alter its analysis accordingly and determine that Will Co. has established a prima facie showing of jurisdiction.

Previously, relying heavily on *AMA v. Wanat,* 970 F.3d 1201 (9th Cir. 2020), this Court concluded that the use of a Content Delivery Network (CDN) in the United States, express reference to United States law, and contracting for ads which were expressly intended for an audience in the forum was not enough to establish express aiming.  *Will Co., Ltd v. Ka Yeung Lee* unequivocally establish that conclusion is wrong.

In *Will Co., Ltd v. Ka Yeung Lee,* the Court found that the ad structure which clearly established profit from the United States market, use of hosting and CDN services permitted faster delivery to the United States, and web pages that addressed legal compliance almost exclusive to the United States established express aiming in the United States market.  These are exactly the same facts here.  In addition, Defendants in *Will Co., Ltd v. Ka Yeung Lee* provide the exact same arguments as presented here, that they do not control advertisements, the use of the CDN in the United States is happenstance to Cloudflare's services, and the web pages referencing U.S. law was part of a template and not intentional.  The Ninth Circuit dismantled these arguments.

In *Will Co., Ltd v. Ka Yeung Lee*, the Ninth Circuit reiterated that "express aiming" is established when a website operator both actively appeals to and profits from an audience in the forum.  *Will Co., Ltd v. Ka Yeung Lee* at p 12, *citing AMA Multimedia,* 970 F.3d at 1210.  Specifically, the Ninth Circuit found the Defendants in *Will Co., Ltd v. Ka Yeung Lee* made "two key choices demonstrating their intent to cultivate an audience in the United States."  *Id.*

PLAINTIFF'S OBJECTIONS TO REPORT AND
RECOMMENDATION - 2  [NO. 3:20-cv-05666 DGE]

**FREEMAN LAW FIRM, INC.**
1107 ½ Tacoma Avenue South
Tacoma, WA 98042
(253) 383-4500 - (253) 383-4501 (fax)

at p 15.  First, the Defendants' choice to host and utilize CDN in the United States because of the reduction of the time it takes for a website to load.    *Id.* at 15-17.  Second, the web pages posted on the website that address legal compliance were relevant almost exclusively to viewers in the United States.  *Id.* at 17-18.

The combination of the CDN and web pages dedicated to compliance with U.S. law established that the defendants intentionally appealed to the United States market.  That geo-targeted ads were used for the United States and that site generated 1.3 million viewers established that the site profited from the United States market.  Accordingly, there is "express aiming" in the United States.

The facts of *Will Co., Ltd v. Ka Yeung Lee* are essentially identical to the facts here. Should this Court follow the Report and Recommendation (Dkt. No. 65) and the initial analysis (Dkt. No. 43), the results on appeal will be the same.  Ninth Circuit law mandates a finding of jurisdiction here.

Additionally, the new evidence presented in Plaintiff's supplemental memorandum (Dkt. No. 61 and 62) adds to the finding that Defendant intended to appeal to a United States market and are circumspect nor "opaque" as found in the Report and Recommendation (Dkt. No. 65).

Defendant's ad broker, Tiger Media, required Defendants to aver that the content of Avgle.com complied with United States law.[1]  Defendants, therefore, utilized an ad broker who was U.S. law compliant.  Viewing the light most favorable to Will Co., as the Court is required to do, *See*, *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002), this means that Tiger Media broadcast in the United States and Defendants knowingly intended for such. This is combined with the fact that Defendants were required for final approval for all content

---

[1]  The Report and Recommendation minimizes the requirements of Tiger Media as "boilerplate" terms of service. Plaintiff is unaware of any case law that "boilerplate" language renders the language meaningless or unintentional by the parties.  Here, "boilerplate" or not, it must be presumed Defendants were aware of the language AND is evidence Defendant knew Tiger Media was United States law compliant and broadcasted in the United States.

PLAINTIFF'S OBJECTIONS TO REPORT AND
RECOMMENDATION - 3  [NO. 3:20-cv-05666 DGE]

FREEMAN LAW FIRM, INC.
1107 ½ Tacoma Avenue South
Tacoma, WA 98042
(253) 383-4500 - (253) 383-4501 (fax)

Tiger Media displayed.  Therefore, the Defendants were aware of the ad content and their use for U.S. viewers.  Such is a strong indication of intent to appeal to the United States market.

## II.   <u>CONCLUSION</u>

If a court decides to rule on personal jurisdiction without an evidentiary hearing, a plaintiff must make only a *prima facie* showing of jurisdictional facts to survive the motion.  *Bauman v. DaimlerChrysler Corp.*, 644 F. 3d 909, 919 (9th Cir. 2011).  Here, consistent with *Will Co., Ltd v. Ka Yeung Lee, et al.*   Ninth Circuit Court of Appeals Cause No. 21-35617, Will Co. has established that the Defendants appealed to and profited from the United States market.

DATED this 31st day of August 2022.

FREEMAN LAW FIRM, INC.

_____*s/ Spencer D. Freeman*_____
Spencer D. Freeman, WSBA # 25069
FREEMAN LAW FIRM, INC.
sfreeman@freemanlawfirm.org

Attorney for Plaintiff Will Co.

PLAINTIFF'S OBJECTIONS TO REPORT AND
RECOMMENDATION - 4  [NO. 3:20-cv-05666 DGE]

**FREEMAN LAW FIRM, INC.**
1107 ½ Tacoma Avenue South
Tacoma, WA 98042
(253) 383-4500 - (253) 383-4501 (fax)

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILL CO., LTD., a limited liability company organized under the laws of Japan, | No. 21-35617 |
| *Plaintiff-Appellant*, | D.C. No. 3:20-cv-05802-BHS |
| v. | |
| KA YEUNG LEE, an individual; YOUHAHA MARKETING AND PROMOTION LIMITED, a foreign company; DOES, 1–20, doing business as ThisAV.com, | OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted May 18, 2022
Seattle, Washington

Filed August 31, 2022

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

## Personal Jurisdiction

The panel reversed the district court's dismissal of a copyright suit for lack of specific personal jurisdiction and remanded for further proceedings.

Will Co. Ltd., a Japanese adult entertainment producer, brought this copyright infringement action against the owners and operators of ThisAV.com, a video-hosting site based in Hong Kong, alleging that the site was displaying without authorization several of its copyrighted works. The district court found that it lacked specific personal jurisdiction over ThisAV.com's owners and operators because Will Co. could not establish that they "expressly aimed" ThisAV.com's content at the United States market, or that it was foreseeable that operating the site would cause jurisdictionally significant harm in the United States. Defendants were Youhaha Marketing and Promotion Limited ("YMP") and Ka Yeung Lee.

The panel held that under Federal Rule of Civil Procedure 4(k), the federal long-arm statute, a federal court may exercise jurisdiction over a foreign defendant if: (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction comports with due process. Defendants conceded the first two elements. As to the third element, the exercise of personal jurisdiction over a defendant comports with due process if a defendant

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

has "minimum contacts" with the relevant forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. In the context of tort claims, like the Copyright Act claims at issue here, a defendant has the requisite minimum contacts with the forum if: (1) the defendant purposefully directs its activities at the forum, (2) the lawsuit arises out of or relates to the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable.

To determine whether defendants purposefully directed their activities at the forum, the panel applied the "*Calder* Effects Test*" and asked whether defendants: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. As to the first element, the panel concluded that both YMP and Lee committed at least one intentional act by operating ThisAV.com and purchasing its domain name and domain privacy services. As to the second element, both defendants did "something more" than mere passive operation of the website. Their advertising structure demonstrated that they profited from viewers in the United States market, and their intent to cultivate an audience in the United States was demonstrated by their choice to host the website in Utah and to purchase content delivery network services for North America, which made the site load faster for viewers there, and by the fact that the webpages they posted on the site that addressed legal compliance were relevant almost exclusively to viewers in the United States. As to the third element, defendants' conduct caused harm in the United States because there were almost 1.3 million visits to their website in the United States during the relevant period, and that harm was foreseeable.

The panel held that defendants "purposefully directed" their operation of ThisAV.com at viewers in the United States. The panel reversed and remanded to the district court to conduct the remainder of the personal jurisdiction analysis under Rule 4(k).

## COUNSEL

Spencer D. Freeman (argued), Freeman Law Firm Inc., Tacoma, Washington, for Plaintiff-Appellant.

Evan Fray-Witzer (argued), Ciampa Fray-Witzer LLP, Boston, Massachusetts; Valentin Gurvits and Frank Scardino, Boston Law Group PC, Newton, Massachusetts; Philip P. Mann, Mann Law Group PLLC, Seattle, Washington; for Defendants-Appellees.

## OPINION

WARDLAW, Circuit Judge:

Will Co. Ltd., a Japanese adult entertainment producer, brought this copyright infringement action against the owners and operators of ThisAV.com, a video-hosting site based in Hong Kong, alleging that the site was displaying without authorization several of its copyrighted works. The district court dismissed the suit, finding that it lacked specific personal jurisdiction over ThisAV.com's owners and operators because Will Co. could not establish that they "expressly aimed" ThisAV.com's content at the United States market, or that it was foreseeable that operating the site would cause jurisdictionally significant harm in the

United States.  We disagree, and reverse and remand for further proceedings.

## I.

### A.

Will Co. Ltd. is a Japanese entertainment company that produces adult videos featuring Japanese models in Japanese environments.  The firm has produced more than 50,000 full-length videos and has registered in the United States for copyright protection for all of them.  It sells access to its videos exclusively on R18.com, and makes over one million dollars a year selling its content to consumers in the United States.

To protect its market share, Will Co. actively investigates and reviews sites that display Japanese erotica for free looking for instances of copyright infringement.  In June 2020, the firm discovered that one of those sites, "ThisAV.com," was displaying thirteen of its videos without permission.  It sent ThisAV.com take-down notices pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c).  When the works were not removed, Will Co. brought this suit against Does 1–20 under the Copyright Act, 17 U.S.C. § 101 *et. seq.*  After limited discovery, revealing that Youhaha Marketing and Promotion Limited ("YMP") owns ThisAV.com, and Ka Yeung Lee ("Lee") serves as a Director of YMP, Will Co. named them as Defendants.

Shortly thereafter, Defendants moved to dismiss this lawsuit under Rule 12(b)(2) for lack of personal jurisdiction.  Will Co. conceded that the district court lacked general personal jurisdiction over either defendant.  Lee is a permanent resident of Hong Kong and currently resides in

Canada, and YMP is registered in Hong Kong and operates ThisAV.com exclusively out of its offices there.  However, Will Co. asserted that the district court had specific personal jurisdiction over both defendants because the tortious conduct in which they allegedly engaged, running ThisAV.com, which unlawfully displayed copyrighted videos, was sufficiently connected to the United States.

In their briefing before the district court, the parties asserted the following relevant facts about the operation of the site.  ThisAV.com is a Japanese-language video-hosting website.  Like YouTube, it allows users to upload and view videos for free and makes its money by displaying ads alongside those videos.  As of February 2021, there were a total of 221,541 user-uploaded videos on the site.  The majority of those videos had titles written in the Japanese alphabet and were in Japanese.

Defendants Lee and YMP created the site and purchased its domain name (ThisAV.com).  They acquired hosting services from an American company, Gorilla Servers, with servers in Utah.  They purchased content delivery network (CDN) services from Cloudflare, another American company, and utilized Cloudflare's network of servers in North America and Asia.  And they purchased a website template with some pre-existing text and images, which they modified to suit their needs.

Most of the website's text is in Japanese.  However, all of the pages focused on legal compliance are in English and are geared toward compliance with United States law.  The "Privacy Policy" page states that it is legal to access the site in the United States, but makes no guarantees about the legality of access from other nations:

> [ThisAV.com] is a website available from its location in the United States of America. We at ThisAV.com do not warrant or make any discretion about its appropriate use and availability outside the aforementioned country. If the ThisAV.com website is accessed outside of the relevant location, those users must comply with their local jurisdiction regarding website access and usage.

The "Terms and Conditions" page states that the content on the site is "subject to copyright and other intellectual copyright under United States, Canada and other foreign laws and international conventions." And finally, two related pages entitled "DMCA" and "2257" provide the site's procedures for compliance with two United States laws, the Digital Millennium Copyright Act,[1] 17 U.S.C. § 512(c), which implements international agreements regarding copyright protection, and 18 U.S.C. § 2257,[2]

---

[1] The "DMCA" page states: "In accordance with the Digital Millennium Copyright Act of 1988 . . . Thisav will respond expeditiously to claims of copyright infringement that are reported to Thisav's designated copyright agent identified below. Please also note that under Section 512(f) any person who knowingly materially misrepresents that material or activity is infringing may be subject to liability . . . All claims of . . . copyright infringement on or regarding this Website should be delivered to Thisav's designated copyright agent at the following email address: copyright@thisav.com . . . ."

[2] The "2257" page states: "With respect to the records as per 18 USC 2257 for any and all content on this site please kindly direct your request to the site for which the content was produced . . . [F]or further assistance and/or information in finding the content's originating site, please contact ThisAV.com compliance at compliance@thisAV.com."

which requires that producers of adult content keep records of all performers' dates of birth and other information.

While YMP and Lee set up the site, they have a relatively limited role in operating it on a day-to-day basis. They do not themselves post any content, as all of the videos on the site are uploaded by users. Nor do they place any ads; rather, they sell all of the advertising space on the site to third-party vendors.[3] Several of those third-party ad vendors use geo-targeting to place their ads, which means that viewers in a particular location are served ads relevant to that location. So, for example, a person visiting the site from China might receive an ad in Chinese for a hotel in Beijing, while a person visiting the site from the United States might receive an ad in English for a hotel in Chicago.

Most of ThisAV.com's viewers are located in Asia. However, the site has a significant audience in the United States. During the period the allegedly infringing videos were on display, April 1, 2020 to June 30, 2020, the site was viewed approximately 28 million times. Nearly 85% of those views came from three countries: Japan (52.5%), Taiwan (15.7%), and Hong Kong (15.4%). Although only 4.6% of the views came from within the Unites States, that percentage amounted to more than 1.3 million views.

**B.**

On June 30, 2021, the district court granted Defendants' motion to dismiss for lack of personal jurisdiction. It held that Will Co. failed to establish two necessary elements for

---

[3] YMP admits that it did contract directly with one advertiser on one occasion, but that advertiser was based in Hong Kong, and the advertisement it placed was not directed at the United States.

specific personal jurisdiction: that the content on ThisAV.com was "expressly aimed" at the United States, and that by operating ThisAV.com Defendants caused "jurisdictionally significant harm." The district court determined that Will Co. failed to establish the Defendants had expressly aimed the site's contents at the United States, reasoning that the jurisdictional facts here are indistinguishable from those of a recent Ninth Circuit case, *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020), in which we found against jurisdiction because the defendant had not expressly aimed the operation of his website at the United States. And the district court held that there was no jurisdictionally significant harm because during the relevant period only 4.6% of the site's viewers were in the United States, so the "brunt of the harm" had occurred elsewhere. This timely appeal followed.

## II.

We review the district court's dismissal for lack of personal jurisdiction de novo. *See Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). When a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). When the Defendant's motion is based on written materials rather than an evidentiary hearing, as is the case here, "we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Id.* (alteration in original) (quoting *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995)). Uncontroverted allegations in the complaint must be taken as true, and conflicts between parties over statements

contained in affidavits must be resolved in the plaintiff's favor. *Id*.

### III.

Federal Rule of Civil Procedure 4(k) governs personal jurisdiction in federal court. In this case, Will Co. contends the district court erred by dismissing this action because it has specific personal jurisdiction[4] under Rule 4(k)(2), often referred to as the federal long-arm statute.

### A.

Under Rule 4(k)(2), a federal court may exercise jurisdiction over a foreign defendant if: (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction comports with due process. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006). Defendants concede that Will Co.'s claim arises under federal law and that they are not subject to jurisdiction in any state court of general jurisdiction, so the determinative question here is whether the exercise of jurisdiction over them comports with due process.

The exercise of personal jurisdiction over a defendant comports with due process if a defendant has "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play

---

[4] A court may exercise either "general" or "specific" personal jurisdiction over a defendant. *Easter v. Am. W. Fin.*, 381 F.3d 948, 960 (9th Cir. 2004). Will Co. concedes that the court lacks general jurisdiction over Defendants, so the only issue is whether the court has specific personal jurisdiction over Will Co.'s claims against Lee and YMP.

and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted); *see also Schwarzenegger*, 374 F.3d at 801. In the context of tort claims, like the Copyright Act claims at issue here, a defendant has the requisite minimum contacts with the forum if: (1) the defendant "purposefully direct[s]" its activities at the forum, (2) the lawsuit "arises out of or relates to the defendant's forum-related activities", and (3) the exercise of jurisdiction is "reasonable." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227–28 (9th Cir. 2011) (internal citations omitted).

This appeal revolves around prong one of that test: whether Defendants "purposefully directed" the content of ThisAV.com at the United States. To determine whether a defendant "purposefully directed" its activities at the forum, we apply the "*Calder* Effects Test" and ask whether the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)); *see also Calder v. Jones*, 465 U.S. 783 (1984). We analyze those factors in turn.

## B.

Both YMP and Lee committed at least one "intentional act." For the purposes of personal jurisdiction, a defendant acts intentionally when he acts with "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. We have held that "operating a passive website," purchasing a domain name and purchasing domain privacy services are all intentional acts. *AMA Multimedia*, 970 F.3d at 1209 (citation omitted);

*see also Pebble Beach*, 453 F.3d at 1156.  It is undisputed that YMP operated ThisAV.com, and that Lee purchased its domain name and domain privacy services.  Thus, the first purposeful direction element is readily satisfied.

### C.

Whether Lee and YMP "expressly aimed" ThisAV.com at the United States market is a closer question.  In examining whether "tortious conduct on a [globally] accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed," we look to the actions of the operators in operating the site.  *Mavrix*, 647 F.3d at 1229.  Mere passive operation of a website is insufficient to demonstrate express aiming.  *See AMA Multimedia,* 970 F.3d at 1209–1210 (citation omitted) (requiring "something more" than simply making the website accessible in the forum).  Rather, the operator must have both actively "appeal[ed] to" and "profit[ed] from" an audience in that forum.  *Id.* at 1210.

For example, in *Mavrix Photo Inc., v. Brand Technologies, Inc.*, 647 F.3d 1218 (9th Cir. 2011), Mavrix Photo, an agency that licensed candid photos of celebrities to publications like *People* and *US Weekly* magazines, sued Brand Technologies and Brad Mandel (collectively "Brand"), who operated the celebrity gossip website celebrity-gossip.net, for copyright infringement in the Federal District Court for the Central District of California.  *Id*. at 1221–24.  Mavrix alleged that Brand had displayed several of its copyright protected photos on celebrity-gossip.net without its permission.  *Id*. at 1223.  Brand moved to dismiss, arguing the Central District of California lacked specific personal jurisdiction.  *Id*.

We held that Brand had "expressly aimed" the content of celebrity-gossip.net at the California market because it had both appealed to and profited from consumers there. *Id.* at 1229. It appealed to the California market by posting stories and ads that were particularly relevant to California consumers. For example, it posted stories about the "the California-centered celebrity and entertainment industries," and ads for jobs, hotels, and vacations in California. *Id.* at 1222, 1230. And it "profit[ed] from" California consumers through advertising revenue. *Id.* at 1231. Brand made its money by selling the advertising space on its website to third-party advertisers, so "the more visitors there [were] to the site, the more hits that [were] made on the advertisements; the more hits that [were] made on the advertisements, the more money that [was] paid by the advertisers to Brand." *Id.* at 1230. Therefore, because "[a] substantial number of hits to Brand's website came from California residents," California consumers had generated a substantial profit for the firm. *Id.*

By contrast, in *AMA Multimedia v. Wanat,* 970 F.3d 1201 (9th Cir. 2020), we found that AMA, an adult entertainment producer, had not met its burden to show that the defendant Marcel Wanat, the operator of ePorner.com, an adult-video-hosting site similar to ThisAV.com, had actively appealed to the United States market. *Id.* at 1204. Unlike in *Mavrix,* the content of the site's videos and advertisements provided no evidence of Wanat's subjective intent to appeal to or profit from users in any particular forum because all of the videos were uploaded by users, and all of the advertisements were placed by third parties not located in the United States who tailored the advertising themselves. *Id.* at 1210–11. Thus, although over 20% of ePorner.com's traffic derived from United States users, that fact shed little light on whether ePorner.com was expressly

aimed at those users in light of the advertising structure it employed.  *Id.*

AMA pointed to two other pieces of evidence that Wanat had actively targeted the United States market, both of which we rejected.  First, AMA pointed to Wanat's choice to use Tiggee as a domain service provider.  Tiggee advertised itself as one of the fastest domain service providers for site visitors in the United States.  *Id.* at 1212.  However, AMA adduced no evidence that Wanat had selected Tiggee or was motivated to do so because he wanted to appeal to U.S. viewers.  *Id.*  Second, AMA argued that every website visitor assented to the site's Terms of Service.  Therefore, Wanat had entered into a contract with every person who used the site, including visitors in the United States.  *Id.*  We explained that while those terms of service "could create specific jurisdiction in the United States for [suits alleging] violation of those terms," they "[did] not evince Wanat's or ePorner's effort to target the U.S. market" because they were irrelevant to Wanat's subjective intent.  *Id.*  Therefore, even though Wanat had likely profited from the forum—nearly 20% the site's traffic came from the United States— Plaintiffs did not meet their burden to show he had actively appealed to consumers in the U.S., so there was no "express aiming."  *Id.* at 1211.

Here, unlike in *AMA Multimedia*, Will Co. met its burden of showing "something more" to demonstrate that Defendants "appeal[ed] to" and "profit[ed] from" the U.S. market.  *Id.* at 1210.  First, the advertising structure Defendants employed demonstrated that they profited from viewers in the United States market.  Like the Defendants in *Mavrix*, ThisAV.com "makes its money by selling advertising space on its website to third-party advertisers," so "the more visitors there are to the site, the more hits that

are made on the advertisements; [and] the more hits that are made on advertisements, the more money that is paid by the advertisers to [YMP and Lee]." *Mavrix*, 647 F.3d at 1230. Therefore, because ThisAV.com was viewed by people in the United States more than 1.3 million times during the relevant period, the site earned considerable revenue from that market.

Whether Defendants intentionally appealed to U.S. consumers is a closer question. However, unlike the Plaintiff in *AMA*, Will Co. provided evidence that Defendants made at least two key choices demonstrating their intent to cultivate an audience in the United States.

First, Defendants chose to host the website in Utah and to purchase content delivery network services for North America, which reduced the time it takes for the site to load in the United States. The time it takes for a site to load, sometimes referred to as a site's "latency," is critical to a website's success.[5] For one, swift loading is essential to getting users in the door. The faster a site loads in a particular location, the better its search engine optimization (SEO) will be there, that is, the higher it will appear in search engine results as compared to competitors.[6] Appearing early in search results is critical to attracting web traffic. Studies show that 93% of online experiences begin with the user

---

[5] *See What is a CDN? How do CDNs Work?*, Cloudflare, available at https://www.cloudflare.com/learning/cdn/what-is-a-cdn/ (last visited Aug. 9, 2022); *What is Latency?*, Cloudflare, https://www.cloudflare.com/learning/performance/glossary/what-is-latency/ (last visited Aug. 9, 2022).

[6] *See How Site Speed Influences SEO*, Yoast, https://yoast.com/how-site-speed-influences-seo/ (Nov. 13, 2018) (last visited Aug. 9, 2022).

typing something into a search engine,[7] and that the results on the first page receive nearly 92% of overall traffic for that term.[8] Swift loading is also crucial to keeping potential site visitors engaged. Research shows that sites lose up to 10% of potential visitors for every additional second a site takes to load,[9] and that 53% of visitors will simply navigate away from a page that takes longer than three seconds to load.[10] Even tiny differences in load time can matter. Amazon recently found that every 100 milliseconds of latency cost it 1% in sales.[11]

There are a few ways sites can make their pages load faster. For one, the site's operators can choose to host their

---

[7] *See* AJ Agarwal, *How To Optimize Your SEO Results Through Content Creation*, Forbes, https://www.forbes.com/sites/ajagrawal/2017/08/30/how-to-optimize-your-seo-results-through-content-creation/?sh=28612ea2aa37 (Aug. 30, 2017) (last visited Aug. 9, 2022).

[8] *See* Kelly Shelton, *The Value of Search Results Rankings*, https://www.forbes.com/sites/forbesagencycouncil/2017/10/30/the-value-of-search-results-rankings/?sh=56b02d0544d3 (Oct. 30, 2017) (last visited Aug. 23, 2022); Alex Valencia, *Why SEO Still Matters in 2020*, Forbes, https://www.forbes.com/sites/forbesagencycouncil/2020/03/10/why-seo-still-matters-in-2020/?sh=86686b734b14 (Mar. 10, 2020) (last visited Aug. 9, 2022).

[9] *See* Matthew Wall, How Long Will You Wait For a Shopping Website to Load, BBC News, https://www.bbc.com/news/business-37100091 (Aug. 19, 2016) (last visited Aug. 9, 2022).

[10] *See Consumer Insights*, Google Data, https://www.thinkwithgoogle.com/consumer-insights/consumer-trends/mobile-site-load-time-statistics/ (last visited Aug. 9, 2022).

[11] *See Amazon Study: Every 100ms in Added Page Load Time Cost 1% in Revenue*, ContentKing, https://www.contentkingapp.com/academy/page-speed-resources/faq/amazon-page-speed-study/ (Aug. 10, 2021) (last visited Aug. 22, 2022).

site on servers near their desired audience. The closer a viewer is located physically or geographically to the host server, the faster that page will load for the viewer.[12] Second, the site's operators can purchase access to a content delivery network (CDN), a distributed network of servers covering a particular geographic area, which permits users to access the site from any server in the network, not just the host server, and thus decreases the distance between users and the server.[13] This allows persons within the area covered by the CDN to access the site more quickly.

In this case, by choosing to host ThisAV.com in Utah and to purchase CDN services for North America, Defendants chose to have the site load faster for viewers in the United States and slower for viewers in other places around the world. Given how important loading speed is to achieving and maintaining an audience, Defendants' choice is good evidence that they were motivated to appeal to viewers in the United States more than any other geographical location.

Second, the webpages Lee and YMP posted on the site that address legal compliance are relevant almost exclusively to viewers in the United States. The "Privacy Policy" page specifically guarantees that it is lawful for persons in the United States to access ThisAV.com, but provides no such guarantee for persons in other nations:

---

[12] *See What is Latency?,* Cloudflare, https://www.cloudflare.com/learning/performance/glossary/what-is-latency/ (last visited Aug. 9, 2022).

[13] *What is a CDN? How do CDNs Work?*, Cloudflare, https://www.cloudflare.com/learning/cdn/what-is-a-cdn/ (last visited Aug. 9, 2022).

> ThiaAV.com [sic] is a website available from its location in the United States of America. We at ThisAV.com do not warrant or make any discretion about its appropriate use and availability outside the aforementioned country. If the ThisAV.com website is accessed outside of the relevant location, those users must comply with their local jurisdiction regarding website access and usage.

Further, while the "Terms and Conditions" page states that the content on the site is "subject to copyright and other intellectual copyright under United States, Canada and other foreign laws and international conventions," the site provides specific pages dealing with compliance with United States law only: the "DMCA" page and the "2257" page. Notably, while the majority of the site is in Japanese, the legal compliance pages are in English, and thus readily comprehensible to the average person in the United States.

Defendants' counterarguments are unavailing. First, they object to two of Will Co.'s factual assertions. They object to Will Co.'s assertion that the CDN they purchased only decreases latency in North America and Asia, arguing that it actually decreases latency all around the world. However, at this stage, we resolve factual disputes in favor of the plaintiff, so we must assume that the CDN Defendants purchased decreased load times in North America and Asia only. *See Schwarzenegger*, 374 F.3d at 800.

Defendants also object to Will Co.'s assertion that they intentionally posted the compliance pages. They claim that the content on those pages came with the website template they purchased, and that they inadvertently failed to remove

it. Will Co. counters that even if those pages came with the template Defendants used, they chose to customize them with their own contact information, which demonstrates they knew the pages existed and made the decision to keep them. Again, at this stage we resolve factual disputes in favor of the plaintiff, so for the purposes of resolving this motion, we must assume that Defendants intended to post the content that appears on the compliance pages, and thus that it is evidence of their subjective intent to target the U.S. market. *Id.*

Second, Defendants point to several cases holding that the location of a site's server alone cannot establish express aiming. However, the authority they cite simply states that the location of the server *alone* is insufficient to establish personal jurisdiction, not that it is irrelevant to the analysis. *See, e.g.*, *Hungerstation LLC v. Fast Choice LLC*, No. 20-15090, 2021 WL 1697886, at *2 (9th Cir. Apr. 29, 2021) ("Our circuit has never decided that personal jurisdiction is proper over a private foreign entity *solely* because that entity engaged in tortious conduct from a location outside of the United States by remotely accessing servers located in the United States.") (emphasis added).

Finally, Defendants argue that the evidence of intentionality shows only that they anticipated persons in the United States might access the site and therefore prepared for them, not that they specifically sought out those viewers. Defendants are correct that the fact that a site's operators anticipated persons from a particular forum might access the site is not enough to show they actually desired those viewers. *See AMA Multimedia*, 970 F.3d at 1210 ("Although Wanat may have foreseen that ePorner would attract a substantial number of viewers in the United States, this alone does not support a finding of express aiming."). So here, it

would be insufficient for Defendants to have simply anticipated people from the United States might access ThisAV.com and to have set up pages to make sure they could do so lawfully. But in this case, Defendants did significantly more than that. In addition to the hosting and CDN, the site specifically states that access is *only* lawful in the United States, and provides compliance procedures *only* for the United States, which means it prepared for U.S. visitors to the exclusion of all others.

Therefore, we find that the Defendants both appealed to and profited from a United States audience, and thus expressly aimed the site at the United States.

## D.

Finally, Will Co. must show that the conduct at issue caused harm in the United States, and that that harm was foreseeable. *See Keeton v. Hustler Magazine,* 465 U.S. 770, 776 (1984); *see also Dole Food Co.*, 303 F.3d at 1113.

A defendant causes harm in a particular forum when the "bad acts" that form the basis of the plaintiff's complaint occur in that forum. *Mavrix,* 647 F.3d at 1231. If a Defendant's actions cause harm in multiple fora, jurisdiction is proper in any forum where a "sufficient" amount of harm occurs, even if that amounts to only a small percentage of the overall harm caused. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc) ("We take this opportunity to clarify our law and to state that the 'brunt' of the harm need not be suffered in the forum state. If a jurisdictionally sufficient amount of harm is suffered in the forum . . . it does not matter that even more harm might have been suffered in another [forum]."). For example, in *Keeton v. Hustler Magazine,* 465 U.S. 770 (1984), the Supreme Court held that New Hampshire had

personal jurisdiction over the publisher of a national magazine, Hustler, even though just over one percent of sales occurred in that state, because that one percent still amounted to "a substantial number of copies." *Id.* at 780–81. We find this case is closely analogous to *Keeton*. While just 4.6% of ThisAV.com's views occurred in the United States during the relevant period, that amounted to over 1.3 million visits, an undeniably "substantial" number. *See also AMA Multimedia*, 970 F.3d at 1220 (Gould, J., dissenting).

We also find that the harm was foreseeable. The operators of ThisAV.com actively appealed to a U.S. audience, knew that a significant number of people in the United States were actually viewing the website, and were put on notice that they were hosting infringing content when Will Co. sent them a takedown notice. In light of that, it's hard to see how Defendants could have failed to anticipate the harm that occurred in the forum.

## IV.

For the reasons stated above, we conclude that Defendants "purposefully directed" their operation of ThisAV.com at viewers in the United States. We **REVERSE**, and **REMAND** to the district court to conduct the remainder of the personal jurisdiction analysis under Rule 4(k).

Case: 21-35617, 05/06/2022, ID: 12438643, DktEntry: 43-2, Page 26 of 78





# What is a CDN? | How do CDNs work?

Explore how a CDN works under the hood to deliver fast, efficient and secure delivery of content to websites and Internet services.

---

**What is a CDN?** ▶

---

Copy article link 🔗

## What is a CDN?

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

A content delivery network (CDN) refers to a geographically distributed group of servers which work together to provide fast delivery of Internet content.

Case: 3:20-cv-05666-DGE   Document 43   Filed 08/31/22   Page 27 of 78

A CDN allows for the quick transfer of assets needed for loading Internet content including HTML pages, javascript files, stylesheets, images, and videos. The popularity of CDN services continues to grow, and today the majority of web traffic is served through CDNs, including traffic from major sites like Facebook, Netflix, and Amazon.

A properly configured CDN may also help protect websites against some common malicious attacks, such as Distributed Denial of Service (DDOS) attacks.

## Is a CDN the same as a web host?

While a CDN does not host content and can't replace the need for proper web hosting, it does help cache content at the network edge, which improves website performance. Many websites struggle to have their performance needs met by traditional hosting services, which is why they opt for CDNs.

By utilizing caching to reduce hosting bandwidth, helping to prevent interruptions in service, and improving security, CDNs are a popular choice to relieve some of the major pain points that come with traditional web hosting.

## What are the benefits of using a CDN?

Although the benefits of using a CDN vary depending on the size and needs of an Internet property, the primary benefits for most users can be broken down into 4 different components:

1. **Improving website load times** - By distributing content closer to website visitors by using a nearby CDN server (among other optimizations), visitors experience faster page loading times. As visitors are more inclined to click away from a slow-loading site, a CDN can reduce bounce rates and increase the amount of time that people spend on the site. In other words, a faster a website means more visitors will stay and stick around longer.

2. **Reducing bandwidth costs** - Bandwidth consumption costs for website hosting is a primary expense for websites. Through caching and other optimizations, CDNs are able to reduce the amount of data an origin server must provide, thus reducing hosting costs for website owners.

3. **Increasing content availability and redundancy** - Large amounts of traffic or hardware failures can interrupt normal website function. Thanks to their distributed nature, a CDN can handle more traffic and withstand hardware failure better than many origin servers.

4. **Improving website security** - A CDN may improve security by providing DDoS mitigation, improvements to security certificates, and other optimizations.

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

# How does a CDN work?

At its core, a CDN is a network of servers linked together with the goal of delivering content as quickly, cheaply, reliably, and securely as possible. In order to improve speed and connectivity, a CDN will place servers at the exchange points between different networks.

These Internet exchange points (IXPs) are the primary locations where different Internet providers connect in order to provide each other access to traffic originating on their different networks. By having a connection to these high speed and highly interconnected locations, a CDN provider is able to reduce costs and transit times in high speed data delivery.



Beyond placement of servers in IXPs, a CDN makes a number of optimizations on standard client/server data transfers. CDNs place Data Centers at strategic locations across the globe, enhance security, and are designed to survive various types of failures and Internet congestion.

# Latency - How does a CDN improve website load

# times?

When it comes to websites loading content, users drop off quickly as a site slows down. CDN services can help to reduce load times in the following ways:

- The globally distributed nature of a CDN means reduce distance between users and website resources. Instead of having to connect to wherever a website's origin server may live, a CDN lets users connect to a geographically closer data center. Less travel time means faster service.

- Hardware and software optimizations such as efficient load balancing and solid-state hard drives can help data reach the user faster.

- CDNs can reduce the amount of data that's transferred by reducing file sizes using tactics such as minification and file compression. Smaller file sizes mean quicker load times.

- CDNs can also speed up sites which use TLS/SSL certificates by optimizing connection reuse and enabling TLS false start.

Explore all the ways a CDN helps websites load faster

# Reliability and Redundancy - How does a CDN keep a website always online?

Uptime is a critical component for anyone with an Internet property. Hardware failures and spikes in traffic, as a result of either malicious attacks or just a boost in popularity, have the potential to bring down a web server and prevent users from accessing a site or service. A well-rounded CDN has several features that will minimize downtime:

- Load balancing distributes network traffic evenly across several servers, making it easier to scale rapid boosts in traffic.

- Intelligent failover provides uninterrupted service even if one or more of the CDN servers go offline due to hardware malfunction; the failover can redistribute the traffic to the other operational servers.

- In the event that an entire data center is having technical issues, Anycast routing transfers the traffic to another available data center, ensuring that no users lose access to the website.

Learn more about how a CDN helps keep websites online

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

# Data Security - How does a CDN protect data?

Information security is an integral part of a CDN. a CDN can keep a site secured with fresh TLS/SSL certificates which will ensure a high standard of authentication, encryption, and integrity. Investigate the security concerns surrounding CDNs, and explore what can be done to securely deliver content. Learn about CDN SSL/TLS security

# Bandwidth Expense - How does a CDN reduce bandwidth costs?

Every time an origin server responds to a request, bandwidth is consumed. See how a CDN, like the Cloudflare CDN, cuts down on origin requests and reduces bandwidth costs.

**RELATED CONTENT**

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

CDN Reliability

What is Anycast?

What is a CDN Data Center?

What is an Origin Server?

What is an Edge Server?

**Sales**

Enterprise Sales

Become a Partner

Contact Sales:

+1 (888) 99 FLARE

About CDNs

About CDNs

CDN Features

CDN Servers

CDN Glossary

Learning Center Navigation



© 2022 Cloudflare, Inc.        Privacy Policy        Terms of Use        Report Security Issues        Cookie Preferences        Trademark

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Case: 21-56867, 05/66/2022, ID: 12150643, DktEntry: 8, Page 32 of 78
Case: 3:20-cv-05666-DGE Document 6643 Filed 08/31/22 Page 32 of 78



# What is latency? | How to fix latency

Network latency is the amount of time it takes for a data packet to go from one place to another. Lowering latency is an important part of building a good user experience.

**More on Performance**    ▶

Copy article link 🔗

## What is latency?

Latency is the time it takes for data to pass from one point on a network to another. Suppose Server A in New York sends a data packet to Server B in London. Server A sends the packet at 04:38:00.000 GMT and Server B receives it at 04:38:00.145 GMT. The amount of latency on this path is the difference between these two times: 0.145 seconds or 145 milliseconds.

Most often, latency is measured between a user's device (the "client" device) and a data center. This measurement helps developers understand how quickly a webpage or application will load for users.

Although data on the Internet travels at the speed of light, the effects of distance and delays caused by Internet infrastructure equipment mean that latency can never be eliminated completely. It can and should, however, be minimized. A high amount of latency results in poor website performance, negatively affects SEO, and can induce users to leave the site or application altogether.

## What causes Internet latency?

One of the principal causes of network latency is distance, specifically the distance between client devices making requests and the servers responding to those requests. If a website is hosted in a data center in Columbus, Ohio, it will receive requests fairly quickly from users in Cincinnati (about 100 miles away), likely within 5-10 milliseconds. On the other hand, requests from users in Los Angeles (about 2,200 miles away) will take longer to arrive, closer to 40-50 milliseconds.

An increase of a few milliseconds may not seem like a lot, but this is compounded by all the back-

and-forth communication necessary for the client and server to establish a connection, the total size and load time of the page, and any problems with the network equipment the data passes through along the way. The amount of time it takes for a response to reach a client device after a client request is known as round trip time (RTT). RTT is equal to double the amount of latency, since data has to travel in both directions — there and back again.

Data traversing the Internet usually has to cross not just one, but multiple networks. The more networks that an HTTP response needs to pass through, the more opportunities there are for delays. For example, as data packets cross between networks, they go through Internet Exchange Points (IXPs). There, routers have to process and route the data packets, and at times routers may need to break them up into smaller packets, all of which adds a few milliseconds to RTT.

## Network latency, throughput, and bandwidth

Latency, bandwidth, and throughput are all interrelated, but they all measure different things. Bandwidth is the maximum amount of data that can pass through the network at any given time. Throughput is the average amount of data that actually passes through over a given period of time. Throughput is not necessarily equivalent to bandwidth, because it is affected by latency and other factors. Latency is a measurement of time, not of how much data is downloaded over time.

# How can latency be reduced?

Use of a CDN (content delivery network) is a major step towards reducing latency. A CDN caches static content and serves it to users. (The Cloudflare CDN makes it possible to cache dynamic content as well with Cloudflare Workers.) CDN servers are distributed in multiple locations so that content is stored closer to end users and does not need to travel as far to reach them. This means that loading a webpage will take less time, improving website speed and performance.

Other factors aside from latency can slow down performance as well. Web developers can minimize the number of render-blocking resources (loading JavaScript last, for example), optimize images for faster loading, and reduce file sizes wherever possible. Code minification is one way of reducing the size of JavaScript and CSS files.

It is possible to improve perceived page performance by strategically loading certain assets first. A webpage can be configured to load the above-the-fold area of a page first so that users can begin interacting with the page even before it finishes loading (above the fold refers to what appears in a browser window before the user scrolls down). Webpages can also load assets only as they are needed, using a technique known as lazy loading. These approaches do not actually improve

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

network latency, but they do improve the user's perception of page speed.

# How can users fix latency on their end?

Sometimes, network "latency" (slow network performance) is caused by issues on the user's side, not the server side. Consumers always have the option of purchasing more bandwidth if slow network performance is a consistent issue, although bandwidth is not a guarantee of website performance. Switching to Ethernet instead of WiFi will result in a more consistent Internet connection and typically improves Internet speed. Users should also make sure their Internet equipment is up to date by applying firmware updates regularly and replacing equipment altogether as necessary.

**RELATED CONTENT**

Test the Speed of a Site

How to Make a Site Mobile Friendly

Why Site Speed Matters

Performance and Conversion Rates

What is an Image Optimizer?

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

**Sales**

Enterprise Sales

Become a Partner

Contact Sales:

+1 (888) 99 FLARE

**About Performance**

**Performance and SEO**

**More on Performance**

Glossary

Glossary

**Learning Center Navigation**



© 2022 Cloudflare, Inc.     Privacy Policy     Terms of Use     Report Security Issues     Cookie Preferences     Trademark

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022



Home » SEO blog » SEO basics » How site speed influences SEO

# How site speed influences SEO



**Users expect websites to be *fast*. As the world becomes increasingly mobile, and as consumers expect services to be on-demand and seamlessly delivered, having a poor site speed can seriously impact your SEO.**

Google understands that the time it takes for a page to load is a key part of the overall user experience. Waiting for content to appear, being unable to interact with a page, and even *noticing* delays creates *friction*.

That friction costs not only time, but also money. Research from as far back as 2016 showed that 53% of mobile website visitors will leave if a webpage doesn't load

within three seconds. And those kinds of bad experiences can leave a lasting negative impression of a brand.

In fact, research shows that the level of stress from waiting for slow mobile results can be *more stressful than watching a horror movie*.



Ericsson Mobility Report MWC Edition, February 2016

So it's no surprise that Google has been measuring the speed of your site, and using that in their ranking algorithms, since 2010. More recently, in 2018, the speed of your site on/for mobile devices became a much more important signal, too. They understand that a *good* user experience is a *fast* user experience.

# Frustration hurts your users, and hurts your rankings

And it's not just Google – research from every corner of the web, on all aspects of consumer behavior, shows that speed has a *huge* impact on outcomes.

- 47% of people expect a site to load in less than 2 seconds (wired.com)

- 20% of users abandon their cart if the transaction process is too slow (radware.com)

- Amazon found every 100ms of latency cost them 1% in sales
- The BBC found they lost an additional 10% of users for every additional second their site took to load

These costs and this type of site abandonment happen because users don't like to be *frustrated*. Poor experiences mean that they go elsewhere, visit other websites, and convert with competitors.

Those behaviors are easily tracked by Google (through bounces back to search engine results pages, short visits, and other signals), and are a strong signal that the page shouldn't be ranking where it was.

# Google wants a faster web

Speed isn't only good for users – it's good for Google, too. Slow websites are often slow because they're *inefficient*. They may load too many large files, haven't optimized their media, or don't make use of modern technologies to serve their pages.

That means that Google has to consume more bandwidth, allocate more resources, and spend more money.

Across the whole web, every millisecond they can save, and every byte they don't have to process, adds up quickly. And quite often, simple changes to configuration, processes or code can make websites *much* faster, with no drawbacks.

That may be one reason why Google is so heavily invested in the AMP Project, and why they're so vocal in their education on performance.

A faster web is better for users, and reduces Google's operating costs *significantly*. Either way, that means that they're going to continue rewarding fast(er) sites.

# Getting started

Unsurprisingly, some of the best resources on optimizing your website are from

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Google themselves.

We recommend that you explore their Web Fundamentals documentation to get an understanding of the techniques, tools, and approaches to building faster websites.

There are also a variety of tools available for measuring and monitoring the speed of your site. Here are a few which we recommend trying out:

- Lighthouse, for Google Chrome – one of the most sophisticated performance measurement tools available, and great for benchmarking.

- WebPageTest – provides a waterfall diagram of how all of the assets load on your website. Great for spotting slow resources and bottlenecks.

- Our posts – we have a bunch of great blog posts which explore tools, techniques, and terminology!

Any questions? Let us know in the comments!

Jono Alderson
Jono is our Head of SEO. He's a digital strategist, marketing technologist, and full stack developer. He's into technical SEO, emerging technologies, and brand strategy.

# Coming up next!





**Event**

## WordCamp Jinja 2022

- September 02 - 03, 2022
- Team Yoast is sponsoring WordCamp Jinja 2022 , click through to see if we'll be there, who will be there and more!

See where you can find us next »

**SEO webinar**

## Yoast SEO news webinar - August 30, 2022

- 30 August 2022
- Our head of SEO, Jono Alderson, will keep you up-to-date about everything that happens in the world of SEO and WordPress.

All Yoast SEO webinars »

**Home**

- About us
- Work at Yoast
- Werken bij Yoast (NL)
- Community
- YoastCon
- Developer portal
- Help center
- WordPress hosting

**Products**

**SEO blog**

**Yoast SEO academy**

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

CMO NETWORK – OLD

# How To Optimize Your SEO Results Through Content Creation

**AJ Agrawal** Former Contributor ⓘ

[ Follow ]

Aug 30, 2017, 03:55pm EDT

**New!**
Follow this author to stay notified about their latest stories.
**Got it!**



Shutterstock

It's now become pretty common knowledge that one of the best ways to increase brand exposure is through content marketing. However, the best content in the world won't help you generate leads unless the public is able to discover it in the first place.

This is where search engine optimization (SEO) comes in. By optimizing your content for search, you can ensure that more

Will Co., Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Cookie Preferences

people will find – and potentially engage with – your organization.

Here are a few ways to raise your content's SEO value.

## 1. Use Keywords Effectively

75% of Internet users never scroll past the first page of search results, which means you'll need to get on that first page to capture people's attention. One of the best ways to do this is by coming up with strong keywords that people looking for information about your niche would use when searching.

Chances are you're already naturally including keywords in your content, since you're providing information about a topic. However, there are often keywords you haven't considered that can help you get higher in search rankings.

Try brainstorming what kinds of language potential customers might use to ask questions or describe problems associated with your product or service. Think about relevant topics to your industry, and then create a list of potential keywords for each topic. You can also use keyword research tools like the Google Adwords Keyword Tool to come up with your keyword lists. At that point, you can optimize your content for relevant keywords.

A good rule of thumb is to keep your focus on just one or two keywords per piece of content. This will help you keep the focus of your content narrow enough to make it easier to place keywords in strategic locations – like the first 65 characters of your headline – and avoid keyword stuffing.

## 2. Optimize Multiple Features

Along with the beginning of your headline, there are a few other strategic locations to place your keywords in order to help you best

Will Co; Liang v. Lee
No. 21-35617 archived August 25, 2022

Cookie Preferences

increase the SEO value of your content.

For instance, one of the easiest – but often overlooked – areas to optimize your content is in the URL. Having a clear, simple URL with a keyword or two will help search engines easily figure out what's on the page, making it more likely that your content will appear higher up in search results.

You should also take into account your post length when putting up written content. Although Google tends to prioritize long articles over shorter ones, which means that you should have at least 300 words or so, overly long posts can turn off potential readers. This means articles should be somewhere around 700 words, and you should try to put keywords in about 1 – 2% of your text.

Finally, images are a great way to not only make your content aesthetically pleasing, but also boost your content's SEO value. When you upload a photo, include keywords in the file name and fill out the alt text field with a brief description that includes a lot of those same keywords. Alt text is how search engines understand what an image is about, so filling it with keywords will help your content sit higher in the search rankings. Since 93% of online experiences begin with a search engine, this is extremely valuable to getting more eyes on your website.

### 3. Use Links To Reference Others

Out of the top results on a Google search page, about 99% of the websites have at least one external link. It's important to place internal and external links in your content to increase its SEO value.

Internal links are helpful because they help search engines index your site, pick up on your main keywords, and overall improve the

Will Co. Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Cookie Preferences

pagerank of the pages that you link. Basically, it brings other relevant content you've produced to the attention of search engines, giving you more bang for your buck than keeping everything separate.

External links lead to pages outside your website, which have a couple of uses. For one, they help search engines identify important keywords. More importantly, they help you gather incoming links from other websites as those content creators see you link to them. It's generally good etiquette to provide someone with a link who links to them, especially if the content is related.

Although in an ideal world great content would be all you need to reach a wide audience, the reality is that you'll need strong SEO strategies to expose your website to viewers in the first place. By paying attention to certain SEO techniques, you will be on your way to boosting your content and boosting your marketing ROI.

What are some other useful ways you've been able to boost your content's SEO value?



**AJ Agrawal**

Follow

I am a serial entrepreneur, marketer and advisor to Fortune 500 brands. My growth strategies have been recognized by Fortune, Fox, Fast Company,...

**Read More**

Editorial Standards

Reprints & Permissions

ADVERTISEMENT

Cookie Preferences

LEADERSHIP

# The Value Of Search Results Rankings



**Kelly Shelton** Forbes Councils Member
**Forbes Agency Council** COUNCIL POST | Membership (Fee-Based)

POST WRITTEN BY
**Kelly Shelton**

VP of Marketing at **Boostability** and champion for SMBs.

Oct 30, 2017, 08:00am EDT



Shutterstock

Every business is trying to reach the top page of Google search
results — this the principal aim of any SEO strategy. But what is the
value of a first-page ranking? The answer varies for every keyword,

Cookie Preferences

making it possible to determine exactly how much a ranking is worth to you.

## Calculating Values

To value your current rankings, you need to calculate the return on investment of each of your organic search listings. The best tool to use is Google Adwords, which provides all the information you need about individual keywords. You can use the data to determine the traffic value of each keyword. A simple calculation for traffic value is earnings per click multiplied by the number of searches multiplied by the click-through rate.

## First Page Compared To Later Pages

If you feel disappointed by any of your traffic values, find out where your keyword is currently ranking. It is much more useful to have a ranking on page one than on a later page. This becomes obvious when you consider how few searches end up at the later results pages. According to Moz, the first page of Google captures 71% of search traffic clicks and has been reported to be as high as 92% in recent years.  Second-page results are far from a close second coming in at below 6% of all website clicks.

Furthermore, you need to include ads and searches without clicks in the equation. Only 15% of traffic clicks on an ad or tries a different search. The remaining 85% clicks on results, according to Zero Limit Web. However, this does not mean that you necessarily have a good chance of receiving any of this traffic if you appear on the first page. You need to be near the top: The first five results receive 67.6% of clicks, whereas the remaining five just receive 3.73%.

## How To Reach The Top

Cookie Preferences

Will Cor, Ltd. v. Lee No. 2:1-35617 archived August 25, 2022

Researching the best keywords and including them in your content is just one way to improve your rankings. If you want to reach the top pages, you need to go a step further.

• **Optimize your entire site.** Google will penalize all your pages if your website fails to meet quality and usability standards. We encountered a situation like this when we began working with a company that develops and manufacturers multi-spectral infrared and thermal cameras. The business wanted to promote its brand but had been unable.

Before we began publishing content with targeted keywords, we needed to the fix broken links and other errors Google had flagged.

To fix internal broken links, we use tools like Search Console, Screaming Frog and AWR. These tell us the page the link originated from and where the link is pointing. It is sometimes possible to carry out mass changes, such as in the case that a formatting error prohibits proper links from being populated. In other situations, we go to each page in turn to update the broken links.

The other errors Google had flagged on the camera site included 404 pages and broken or moved images. We fixed and updated these links to ensure a uniform user experience across the site, and updated the sitemap files and robots by removing broken and incorrect links in them. As soon as Google re-indexed the site, the pages started climbing in search results for all keywords. Now, more than 58% of the company's keywords are on page one.

• **Make pages mobile-friendly.** If you've ever struggled to read a page or navigate a website on a mobile device, you'll know how frustrating this can be. Google is also aware of this and favors mobile-friendly content.

Cookie Preferences

• **Gain authority.** You need to show Google that your website offers quality information and is a source that users trust. This involves posting frequently, improving engagement with articles (through social media efforts), and guest blogging. After initiating a strategy that took all the above into account, one of our clients increased impressions by 280%.

• **Focus on links.** Links play a number of roles in ranking. First, Google looks at the wording of hyperlinks in content to determine what keywords are associated with the link being used. For instance, "find out more" is better than "click here." If too many links include the same anchor text the link may be considered suspicious or unnatural.

---

Forbes Agency Council is an invitation-only community for executives in successful public relations, media strategy, creative and advertising agencies. *Do I qualify?*

---

Google also considers the quality of the pages you are linking to. They should be relevant to the content, whether they lead to somewhere else on your own website or to another site.

Finally, you need to limit the number of links that you include in a single piece of content. A few links show Google that you are backing up your claims and providing further information for users. Too many appear like spam and hurt your ranking.

When you run the calculations for your own keywords, it should become clear how high rankings play an integral role in online success. To bring more keywords to the top (for greater visibility and to reach all subsets of your audience), you need to focus on every area of your website and incorporate more than just content creation and keyword research into your marketing strategy.

Cookie Preferences

 **Kelly Shelton**

VP of Marketing at [Boostability](Boostability) and champion for SMBs.

Editorial Standards                                    Reprints & Permissions

ADVERTISEMENT

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Cookie Preferences

**LEADERSHIP**

# Why SEO Still Matters In 2020



**Alex Valencia** Forbes Councils Member
**Forbes Agency Council** COUNCIL POST | Membership (Fee-Based)

POST WRITTEN BY
**Alex Valencia**

Co-owner and Director of Business Development at **We Do Web Content**.

Mar 10, 2020, 08:45am EDT  |  9,553 views



Photo: GETTY

It seems like every day some new "strategy" or technology comes out claiming to the next best thing for business owners. It then

Will Co. Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Cookie Preferences

becomes hard to determine what actually works for growing your business and what's just snake oil.

If you're feeling disillusioned by the countless methods and tools out there, then you might also wonder whether traditional marketing methods are old news. It's common for business owners to question whether strategies like search engine optimization (SEO) or search engine marketing (SEM) still work in 2020.

The reality is that SEO still matters in 2020, though many of the practices and methods have changed. For example, Google's 2019 BERT update lit a fire under SEO professionals to focus more on optimizing content based on search intent rather than keywords. Many businesses still need SEO, but they'll need to adapt to the shifting landscape.

## Customer/Client Aquisition For Locally Focused Businesses

SEO is still one of the best customer acquisition strategies for locally focused businesses. What better way to bring customers in the door (or to your website) than to outrank your local competitors?

With local SEO, you can reach prospective customers and clients by targeting users that are searching in your local area. Google tailors the search results to your geographic location, so, if optimized correctly, your website can dominate the local search results for your niche.

Optimize your locally focused business website with local keywords, fill out your Google My Business profile and other directory profiles, gather positive reviews from past clients or customers and conduct backlink outreach to increase your visibility in local search.

Will Co, Ltd. website
No. 2-35617 archived August 23rd 2022

Cookie Preferences

## Optimizing For Search Intent Through Site Content

Google's BERT algorithm update in late 2019 showed us that Google is getting much better at understanding (through natural language processing) the context of users' searches and the intent behind them. This means that websites that publish content that matches what users are actually searching for may be given higher priority in searches. The key is focusing on the intention behind the search, not how often a specific keyword is used in your content.

Aim to create content that is optimized to answer users' questions and provide as much value as possible. For example, if the keyword you're trying to rank for is "B2B lead generation," do a quick Google search of this term to see what pages are ranking in the search results. Are most of the results service pages (say, B2B lead generation services), or are they blog posts ("What is B2B Lead Generation?"). What's currently ranking can give you a good idea of the type of content you should create. Then, craft content that best provides what the user intended to find. For a service page, that means breaking down the B2B lead generation services you offer, how to contact you, client results, etc. For a blog post, define what B2B lead generation is, how it works, how to get started and anything else a user might want to learn about this topic.

This update matters for bloggers and business owners who are dependant on organic traffic when it comes to generating ad revenue, leads and sales. You can maximize your traffic-generating potential by creating optimized content that best matches what your target audience is looking for and provides more value than the pages that are currently ranking.

## Adopting A Multichannel Approach

Cookie Preferences

Case 3:21-cv-05666-DGE Document 66-3 Filed 08/31/22 Page 53 of 78

We all know the saying "Don't put all your eggs in one basket," and this certainly applies to marketing. If you rely on a single traffic source to drive business to your website, you're putting your business at risk if that channel ever were to dry up or disappear altogether.

Google organic search isn't going anywhere anytime soon, so savvy business owners would do well to use SEO alongside existing traffic channels. By taking a multichannel approach, you can continue generating results through your current campaigns while also opening up a consistent stream of new leads.

While SEO may not be a "set it and forget it" strategy, it does have the potential to drive traffic and leads on autopilot. You can easily outsource SEO and/or content creation so you attract organic traffic without taking time away from your primary marketing channels.

## Brand Authority And Reach

According to a 2014 survey, 84% of the millennial respondents said they don't like advertising (and many of them don't trust it). It seems that many of this generation of buyers are becoming more resistant to traditional tactics like cold calling, email spam and even paid ads.

But with SEO, businesses can reach this demographic where they are already looking for brands — search engines. SEO works as a form of inbound marketing that attracts customers to you rather than interrupting their natural scrolling with pushy sales tactics.

Further, you can broaden your brand's reach by targeting long-tail keywords that attract highly-targeted traffic. Ranking for question-based ("How do I ... ?") or comparative ("brand A versus brand B")

Cookie Preferences

keywords can solidify your brand as an authority on a topic and position you against your competitors.

Plus, there is massive potential for you to rank for descriptive keywords that draw in a wider audience. For example, broad terms like "digital marketing methods" or "budget travel tips" may be highly competitive, but they also receive a higher number of searches per month. As you gain momentum (in terms of rankings and traffic) from targeting long-tail keywords, you can start going after broad terms with higher traffic-generating potential.

### Conclusion

While some traditional marketing methods may be becoming obsolete, SEO is here to stay in 2020. Whether you invested in SEO early or are just getting started, it can still be a major driver of traffic and leads to your website.

SEO is particularly beneficial for locally focused businesses, those looking to reach more users with their content and businesses hoping to adopt a multichannel approach. By writing content that's tailored to your audience and optimizing your website for high-traffic keywords, you can expand your reach and boost your brand's authority online.

---

Forbes Agency Council is an invitation-only community for executives in successful public relations, media strategy, creative and advertising agencies. ***Do I qualify?***

---


**Alex Valencia**

President and Director of Business Development at We Do Web. Read Alex Valencia's full executive profile here.

Editorial Standards                                    Reprints & Permissions

ADVERTISEMENT

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Cookie Preferences

Home | War in Ukraine | Coronavirus | Climate | Video | World | US & Canada | UK | More

Business | Tech | Science

Business | Market Data | New Economy | New Tech Economy | Companies | Entrepreneurship

Technology of Business | Economy | CEO Secrets

# How long will you wait for a shopping website to load?

**By Matthew Wall**
Technology of Business editor

🕐 19 August 2016





THINKSTOCK

**How long will you wait for a website to load before you give up and go somewhere else? Ten seconds? Twenty seconds?**

Apparently, nearly half of us won't wait even three seconds.

If a shopping website doesn't load its content within that time, many of us are so impatient we'll immediately jump ship.

And that means a lot of lost business for the online slowcoaches.

According to research from digital performance measurement firm Dynatrace, just a half second difference in page load times can make a 10% difference in sales for an online retailer.

Yet retail websites around the world have actually been getting slower over the last year, not faster, says Dynatrace, despite the general increase in connectivity speeds.

**More people in more places trust BBC News than any other news source.**
**Register for a BBC account to see why.**

Why?

Register

Wilf Co. Ltd. v. Lee
No. 21-35617 archived August 25, 2022

"It's mainly because of all the third-party connections to Google, Facebook and Twitter," says Dave Anderson, the tech firm's vice president of marketing. "These, and chat functionality, are slowing things down, particularly for Australian sites."

This is because data travelling between the US and Australia have to cover huge distances, causing a delay, or latency.



Webpage load times will vary depending on the complexity of the products you're searching for

Australian retail websites have seen average load times increase from 5.4 seconds in 2015 to 8.2 seconds in 2016, says the tech firm - a debilitating time-lag for impatient shoppers.

In the US, the very home of e-commerce, average homepage response times have increased by half a second over the last year, from 3.4 to 3.9 seconds.

And globally, the average page load time has gone up by 7% compared to last year - from 4.2 to 4.5 seconds.

So, ironically, retailers who have been trying to offer a more interactive, personalised multimedia online experience for their customers have been shooting themselves in the foot.



THINKSTOCK

| Some online retailers are struggling to meet shoppers' rising expectations

All these add-ons have got in the way of the main aim - to sell stuff. Fast.

"With consumers used to lightning-fast speeds through the use of tools such as Google search, expectations are higher than ever, meaning even the slightest glitch or delay can leave them feeling disgruntled," says John Rakowski, director of technology strategy at AppDynamics, a performance monitoring firm.

"The level of choice at the fingertips of today's consumers means they will simply go to a competitor to complete the transaction, causing the sale to be lost forever. And convincing them to come back for another purchase will be an uphill struggle."

# Split second

But can fractions of a second really make that much of a difference?

In a word, yes. North American fashion retailer Nordstrom saw online sales fall 11% when its website response time slowed by just half a second, says Gopal Brugalette, who was the retailer's senior applied architect in performance engineering at the time.

When you have total annual sales in the region of $14bn (£10.6bn) across 121 stores in the US and Canada, that's tens of millions being lost.



> If our site goes slow, our sales will drop, which is why we monitor our performance 24/7
>
> Gopal Brugalette, website engineer, Nordstrom

NORDSTROM

"The pages had been getting richer, with 360-degree images and video, for example, which added to their complexity," he says.

The bigger the size of a digital file, the longer it will take to load on the page.

An innovative online "dressing room" seemed like a great way to impress customers, he says, but it didn't work because it slowed the website down too much and sales dropped.

Page load times will vary depending on the type of products customers are looking at, the speed of the networks and devices they're using, and how far they are from the retailer's web servers, says Mr Brugalette.



REUTERS

Will Co. Ltd. v. Lee
No. 21-35617 archived August 25, 2022

> Nordstrom saw its online sales fall 11% when its website slowed by half a second

"There's a lot we can't control. No two customers will have the same web experience at the same time, because an image of a multi-coloured dress will take longer to load than a plain one," he explains.

Nordstrom believes a page load time of 2.5 seconds or below strikes the right balance between functionality and speed.

But the bottom line is that "if our site goes slow, our sales will drop, which is why we monitor our performance 24/7".

Conversely, the faster you make your website or app, the more likely it is you'll make more sales. Office stationery retailer Staples, for example, saw its online sales increase 10% after speeding up its website by a second.

# Balancing act

Retailers face the almost impossible task of offering a fast, stable, easy-to-use website or app that is also visually rich and integrated with social media.

"Personalisation requires the use of scripts, images and integrations with other applications and systems, and this can take its toll on performance, especially during busy retail periods such as Black Friday or the Christmas season," says Mr Rakowski.

To make things more difficult for them, many don't even know that their sites are running slowly because their IT teams are concentrating more on keeping the service up and running than on speed and performance, says Mr Brugalette.

But website architects are now getting very clever at fooling customers into thinking pages are loading faster than they really are, he says.

"Say you Google search for 'brown shoes' then click on a link. If brown shoes are the first thing you see on the page you feel that the page has loaded fast, so it's important to make sure the page loads in a particular sequence."

So online shoppers want speed, simplicity, and reliability all wrapped up in a fun, multimedia experience. Retailers that can offer all this - however technically difficult - will be on to a winner.

**Follow Matthew on Twitter**

**Click here for more Technology of Business features**

WilmerHale LLP Lee
No. 21-35617 archived August 25, 2022

# Top Stories

### Judge orders release of Trump search court papers

1 hour ago

### World narrowly avoided nuclear accident - Zelensky

2 hours ago

### Putin orders 10% boost in Russian troop numbers

8 hours ago

# Features



### 'Kill us, but don't deport us to Myanmar'



### On call with Italy's horseback doctor



### Is Biden's student debt forgiveness fair?



### Why African countries are buying Turkish drones



### People in Kyiv on the shock of six months of war



### Why India made a U-turn on free trade deals



### Why Auckland is the 'spongiest' city



### The workplace stigma that won't budge



### The war is static, but ousting Russia is a seismic task

# Elsewhere on the BBC

Will Co. Ltd. v. Lee
No. 21-35617 archived August 25, 2022



## Turkey's massive subterranean city



## The language with no known origin



## Why overthinkers struggle with remote work

## Most Read

**1** World narrowly avoided nuclear accident - Zelensky

**2** Judge orders release of Trump search court papers

**3** Massive Russian gas burning puzzles experts

**4** Putin orders 10% boost in Russian troop numbers

**5** Guide dog left squashed on plane, says owner

**6** Cancelling student debt: Essential, or like burning money?

**7** Hospital rant at Zimbabwean goes viral in S Africa

**8** French anger at UK sewage dumped in sea

**9** 'Getting custody papers on stage was vicious'

**10** Eurovision star faces Russian hate campaign

*Will Co, Ltd. v. Lee*
*No. 21-35617 archived August 25, 2022*

Terms of Use     About the BBC     Privacy Policy     Cookies     Accessibility Help     Parental Guidance

Contact the BBC     Get Personalised Newsletters     Why you can trust the BBC     Advertise with us

AdChoices / Do Not Sell My Info

© 2022 BBC. The BBC is not responsible for the content of external sites. **Read about our approach to external linking.**

(60 of 74)

Think with                                         Log In



53%    of visits are abandoned if a mobile site
        takes longer than 3 seconds to load.

Google Data, Global, n=3,700 aggregated, anonymized Google Analytics
data from a sample of mWeb sites opted into sharing benchmark data,
March 2016.                                                      

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

**APPEARS IN**

Find out how you stack up to new industry benchmarks for mobile page speed  ➔

Micro-Moments Now: 3 new consumer behaviors playing out in Google search data  ➔

# Related Data

                                                
Menu                                        Search                                      Latest

# Think with Google

Log In

**54%**

of people say their phones reduce stress and/or anxiety in their lives.

International Women's Day reached peak search interest in March 2017 — the same month that global search interest in gender equality reached its highest point.

Google

Google/Heart+Mind Strategies

**60%**

of people say smartphones help them feel more confident and prepared.

Google/Heart+Mind Strategies

**79%**

of people say they're more likely to revisit and/or share a mobile site if it is easy to use.

Google/Heart+Mind Strategies


Menu


Search


Latest

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

# Think with Google

Log In

# Discover the latest data, insights, and inspiration from Think with Google.

Consumer Insights

Marketing Strategies

Future of Marketing

Tools

United States

*Will Co, Ltd. v. Lee*
*No. 21-35617 archived August 25, 2022*


Menu


Search


Latest

Case 3:20-cv-07662-DGE Document 66-3 Filed 08/31/22 Page 67 of 78



# Think with Google

    

Log In

## Google

About Google

About Think with Google

Creative Resources

Products

Privacy & Terms

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022


Menu


Search


Latest



(/)

MENU

Features (/features/)

Overview (/features/)

SEO Auditing (/features/seo-auditing/)

SEO Monitoring (/features/seo-monitoring/)

SEO Alerting (/features/seo-alerting/)

SEO Change Tracking (/features/seo-change-tracking/)

Log File Analysis (/features/log-file-analysis/)

Insights & Reporting (/features/seo-insights-reporting/)

APIs & Integrations (/features/api-integrations/)

Solutions (/solutions/for-agencies/)

**BY INDUSTRY**

Agencies (/solutions/for-agencies/)

eCommerce (/solutions/for-ecommerce/)

Marketplaces (/solutions/for-marketplaces/)

Publishers (/solutions/for-publishers/)

Travel (/solutions/for-travel/)

**BY ROLE**

Executives (/solutions/for-executives/)

Marketing Managers (/solutions/for-marketing-managers/)

Technical SEOs (/solutions/for-technical-seos/)

Content Teams (/solutions/for-content-teams/)

Developers (/solutions/for-developers/)

Case studies (/case-studies/)

Academy (/academy/)

Overview (/academy/)

SEO Fundamentals (/academy/seo-fundamentals-hub/)

Technical SEO (/academy/technical-seo-hub/)

eCommerce SEO (/academy/ecommerce-seo-hub/)

International SEO (/academy/international-seo-hub/)

Structured Data (/academy/structured-data-hub/)

Content & SEO Processes (/academy/processes-hub/)

SEO Reporting & Management (/academy/reporting-management-hub/)

Google Search Console (/academy/google-search-console-hub/)

Frequently Asked SEO Questions (/academy/faq/)

Blog (/blog/)

View all (/blog/)

Feature Announcements (/blog/feature-announcements/)

SEO in Focus (/blog/seo-in-focus/)

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Case 3:20-cv-05671-JD   Document 663-3   Filed 08/31/22   Page 69 of 78

Industry News (/blog/industry-news/)

Other (/blog/other/)

Certified Partners (/certified-partners/)

United States (/certified-partners/united-states/)

United Kingdom (/certified-partners/united-kingdom/)

Benelux (/certified-partners/benelux/)

Other (/certified-partners/other/)

Careers (/careers/)

Support (/support/)

Contact (/contact/)

Start Trial    (/go/url/)

Home (/)    Academy (/academy/)    Page Speed Resources (/academy/page-speed-resources/)    FAQ (/academy/page-speed-resources/faq/)    Amazon Page Speed Study

# Amazon study: Every 100ms in Added Page Load Time Cost 1% in Revenue

Last updated: AUGUST 10, 2021

Back in 2006, Amazon found that every 100ms in added page load time cost them 1% in sales. This has now become one of the most referenced data points surrounding page speed and web performance — standing the test of time as a clear example for why having a fast site is important.

For context, a 1% loss of annual revenue for Amazon    (https://www.macrotrends.net/stocks /charts/AMZN/amazon/revenue) in 2006 would have been around $107 million. Today, this would be about $3.8 billion!

The findings come from former Amazon software engineer Greg Linden, who worked at the company during its early years, long before it became the retail giant that we know today.

First referenced on his blog, Geeking with Greg    (http://glinden.blogspot.com/2006/11/marissa-mayer-at-web-20.html), he wrote in response to a similar speed experiment from Google:

Will Cui Ltd. v. Lee
No. 21-35617 archived August 25, 2022

> *This conclusion may be surprising – people notice a half second delay? – but we had a similar experience at Amazon.com. In A/B tests, we tried delaying the page in increments of 100 milliseconds and found that even very small delays would result in substantial and costly drops in revenue.*

Then he expanded on this <u>during a presentation</u> <u>(http://glinden.blogspot.com/2006/12/slides-from-my-talk-at-stanford.html)</u> he gave for a data mining class at Stanford, titled "Make Data Useful". Fittingly, the slide "Speed Matters" shared how every 100ms delay cost Amazon 1% of sales.



<u>(http://glinden.blogspot.com/2006/12/slides-from-my-talk-at-stanford.html)</u>

The lesson being, both then and now, is that speed matters because it has such a big impact on your revenue.

## Why is page speed so important?

The study from Amazon showed that even milliseconds matter when it comes to page speed.

Here's why speed should be a top priority on your site.

# User Experience

First and foremost, visitors love fast sites (/academy/page-speed-resources/).

They want things fast, easy, and without any friction. And with a majority of marketplaces now online and the growing availability of global customers, there's more competition than ever before to attract and keep visitors on your site. Even a few seconds could make the difference between getting a sale or giving it to someone else.

This means to provide a good user experience, you must have a fast site.



## Rankings

Over the past few years, Google has announced different updates that prioritize speed in their algorithm. The search team announced speed would be a ranking signal for desktop searches in 2010 (https://developers.google.com/search/blog/2010/04/using-site-speed-in-web-search-ranking), followed by the Speed Update (https://developers.google.com/search/blog/2018/01/using-page-speed-in-mobile-search) in 2018 for mobile searches.

And now as part of the Page Experience update, Google will start using Core Web Vitals as a ranking signal. Core Web Vitals measure (/academy/core-web-vitals/#what-are-they) the user experience of a page — specifically speed, responsiveness and visual stability. These metrics are included with existing User Experience signals for a new ranking factor category called "Search signals for page experience" (https://developers.google.com/search/docs/advanced/experience/page-experience).

In short, Google rewards pages that provide a good user experience in its SERP.

## Revenue

All together, this means a fast site is important for your bottom line.

Having a fast site makes for a good user experience, which helps improve rankings and brings in visitors, which keeps them on your site and ultimately leads to more conversions.

Since Google's most important instrument to measure speed is Core Web Vitals, you'll want to keep a watchful eye on this and know if you are no longer passing the Core Web Vitals Assessment. ContentKing monitors your site's Origin Summary (field data) and Lighthouse metrics (lab data) for all of your pages, and alerts you if the performance of your pages drops significantly.



## ContentKing Academy

Read the full Academy article to learn everything about Page Speed Resources (/academy /page-speed-resources/)

## Monitor Core Web Vitals

Receive alerts when your site stops passing the Core Web Vitals Assessment!

www.example.com



## Start your free trial

NO CREDIT CARD NEEDED

TRUSTED BY THE BEST

FANTASTIC REVIEWS

4.8 / 5          4.9 / 5    (/reviews/)

# Start your free trial

Get up and running in 20 seconds

www.example.com



Start your free trial

NO CREDIT CARD NEEDED

4.8 / 5          4.9 / 5          9.7 / 10

No credit card required

No installation needed

No strings attached

## Blog    View all **(/blog/)**

ContentKing Log File Analysis for Fastly (/blog/log-file-analysis-extended-fastly/)

Extended ContentKing Log File Analysis (/blog/log-file-analysis-extended/)

ContentKing & Conductor at brightonSEO (/blog/brightonseo-spring-recap-2022/)

brightonSEO Spring 2022 (/blog/brightonseo-spring-2022/)

G2 Leader Awards for ContentKing (/blog/g2-awards-spring-2022/)

## Academy    View all **(/academy/)**

Robots.txt (/academy/robotstxt/)

Redirects (/academy/redirects/)

Shopify SEO Guide (/academy/shopify-seo/)

Magento 2 SEO Guide (/academy/magento-seo/)

Will Co. Ltd. v. Lee
No. 21-35617 archived August 25, 2022

# About us(/about-us/)

Our story (/about-us/)

Meet our team (/team/)

Careers (/careers/)

Contact us (/contact/)

130+ user reviews (/reviews/)

Support (/support/)

UK: +44 20 3290 8992 (tel:00442032908992)
US: +1 919-647-9205 (tel:0019196479205)

support@contentkingapp.com (mailto:support@contentkingapp.com)

Sign up for our newsletter (/newsletter/)

Will Co, Ltd. v. Lee
No. 21-35617 archived August 25, 2022

Copyright © 2022 ContentKing

Accessibility (/accessibility/)    Privacy Policy (/legal/privacy-policy/)    Cookie Policy (/legal/cookie-policy/)

Cookie Preferences    Terms of Use (/legal/terms-of-use/)

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)  A.  Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.  Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
>
> ► The proceeding involves a question of exceptional importance; or
>
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2) Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-2.

**(3) Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4) Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- A response, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or response must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)

- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees

- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari

- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions

- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send an email or letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Maria Evangelista (maria.b.evangelista@tr.com));
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form10instructions.pdf*

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to *(party name(s))*:

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee / Appeal from Bankruptcy Appellate Panel Docket Fee | | | | $ |
| **TOTAL:** | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 10**                                                    *Rev. 12/01/2021*